## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ROCK HILL DIVISION
### Case No.   0:15-cv-04841-JFA

| | |
|---|---|
| **AMERICAN LANTERN PRESS, INC.**<br><br><br>**Plaintiff,**<br><br>**vs.**<br><br>**WILLIAM J. MCCARTHY & ASSOCIATES, INC., WILLIAM J. MCCARTHY III,** and **SUSAN L. KELLY MCCARTHY,**<br><br>**Defendants.** | **COMPLAINT** |

Plaintiff, complaining of Defendants, alleges and says as follows:

### PARTIES JURISDICTION AND VENUE

1.    Plaintiff American Lantern Press, Inc. ("Plaintiff" or "ALP") is a South Carolina corporation with its principal place of business located in Fort Mill, York County, South Carolina.

2.    Upon information and belief, Defendant William J. McCarthy & Associates, Inc. ("WJM&A") is a Virginia corporation with its principal office located in Alexandria, Virginia.

3.    Upon information and belief, Defendant William J. McCarthy III ("Bill McCarthy") is an adult citizen and resident of Alexandria, Virginia, and is the sole or majority shareholder of WJM&A.

4.    Upon information and belief, Defendant Susan L. Kelly McCarthy a/k/a Kelly McCarthy ("Kelly McCarthy") is an adult citizen and resident of Alexandria, Virginia.  Bill McCarthy and Kelly McCarthy are, upon information and belief, husband and wife, and are

hereinafter referred to collectively as the "McCarthys." The McCarthys and WJM&A are hereinafter referred to collectively as the "Defendants."

5.      This Court has jurisdiction over the parties and subject matter of this action. More specifically, this Court has subject matter jurisdiction both pursuant to 28 U.S.C. § 1332(a). due to there being complete diversity of citizenship between ALP and the Defendants, and pursuant to 28 U.S.C. § 1331, due to the federal copyright claims asserted below. Likewise, the Court has personal jurisdiction over all Defendants because the various torts committed by them (set forth in detail, below) all either occurred in South Carolina, or the harm was caused to ALP in South Carolina.

6.      The amount in controversy is believed to exceed $75,000.

7.      This is an action to recover against all Defendants, jointly and severally, for their intentional and malicious theft and misuse of ALP assets and copyrighted materials, and embezzlement and theft of income streams rightly belonging to ALP pursuant to a joint venture agreement between ALP and WJM&A.

## FACTUAL ALLEGATIONS

### *Background and Entry into Joint Venture Relationship*

8.      ALP is a publishing company that specializes primarily in publishing original material, both in print and online, which is designed to aid its readers in living a more independent life. While ALP is perhaps best known for publishing a monthly newsletter called Independent Living News, it also publishes various other print newsletters, and maintains online content at independentlivingnews.com. ALP also offers a variety of other products.

9.      In conjunction with ALP's business, ALP maintains a proprietary list of email addresses provided by subscribers or followers of its content, and this list contains many

hundreds of thousands of addresses (hereinafter interchangeably, the "List" or "the proprietary List").  Aside from ALP's reputation for honesty with readers, the List is ALP's most valuable asset.  ALP earns substantial income by renting the List to approved third parties.

10.     WJM&A holds itself out as a company that specializes in marketing and advertising.

11.     Upon information and belief, at all times pertinent to this Complaint, Bill McCarthy served as the president of WJM&A, and Kelly McCarthy served as the vice-president of WJM&A.  Upon further information and belief, in their respective roles, the McCarthys managed and controlled all aspects of WJM&A's business, and together caused WJM&A to engage in all conduct complained of herein.

12.     In the fall of 2014, ALP entered into an agreement with WJM&A to provide a professional assessment of ALP's business, with a focus on suggesting areas of cost savings and revenue growth potential.  Bill McCarthy performed that work.  The only suggestion made by Bill McCarthy following his "assessment" was that there was an opportunity for ALP and WJM&A to enter into a joint venture relationship.  Bill McCarthy explained to Lee Bellinger (the President of ALP) that the Defendants' collective expertise in marketing and advertising would result in significant increases in ALP's business, while ALP's goodwill and List would help create a much greater presence for WJM&A's business.

13.     Following those preliminary discussions, WJM&A and ALP reached an agreement by which WJM&A would manage ALP's List and content streams, and the two entities would split profits realized from that work.  After reaching an agreement in principle regarding how their relationship would work, Defendants drafted a written Memorandum of Understanding to govern the parties' joint venture relationship (hereinafter, "MOU").

14.    The MOU was executed by WJM&A and forwarded to ALP.  It was accepted and entered by ALP in its offices in York County, South Carolina.  The MOU is hereby incorporated by reference as if fully set forth herein

15.    In conjunction with the negotiation and execution of the MOU, the Defendants promised that they would manage the List in such a manner that the List's proprietary value would be greatly improved, that they would never utilize the List except in the non-profit donor realm in which they work, and certainly not in a manner competitive with or adverse to ALP's interests.

16.    Pursuant to the MOU (and Defendants' written request) and following Defendants' various expressions of good faith, ALP provided its List to WJM&A and gave WJM&A full and unfettered access to ALP's electronic database of editorial content, which is essentially a massive archive of previously-created and/or published editorial material.  The archive of editorial material includes, but is not limited to the full monthly Independent Living News newsletters, including those that were registered with the United States Copyright Office.

17.    WJM&A was permitted to utilize ALP's List and its editorial content solely for purposes related to their joint venture relationship, and ALP remained (and remains) the sole owner of its List and all of its editorial content.

18.    Pursuant to the MOU, ALP and WJM&A agreed that WJM&A would collect all revenue from the rental of ALP's List, and would deposit those funds into a dedicated checking account (hereinafter, the "Escrow Account").  The MOU also required that each month, WJM&A would create and send an accounting to ALP of all List rental revenues received by WJM&A, pending disbursal of joint venture funds from the Escrow Account.

4

***Defendants' Embezzlement of ALP's Portion of the Joint Venture Funds and Misuse of ALP's List***

19.    Almost immediately after entering into the joint venture, the relationship did not work.  Under Defendants' "management," the List's performance began to suffer.  (The commercial value of a mailing list is affected by how it is used, and third parties track such use.)

20.    Defendants failed to timely or properly communicate the work it was doing.

21.    Defendants mostly largely failed to provide detail regarding funds received and costs incurred, including the funds which were to have been deposited in the Escrow Account. Unbeknownst to ALP, upon information and belief, Defendants failed to create the Escrow Account as required by the MOU, and instead collected and commingled all joint venture funds with their own separate funds.

22.    At the same time, however, ALP operated in good faith, and provided regular written updates to the Defendants regarding the work performed by ALP and revenues received by ALP throughout the period of the joint venture relationship.

23.    Rather than continue to suffer the negative effects of the continued joint venture relationship with WJM&A, ALP gave notice in late February 2015 of its election to terminate the MOU, pursuant to the agreement's 90-day notice of termination provision.

24.    After ALP gave notice of its termination of the MOU, ALP repeatedly sought to clarify the parties' working relationship in the period pending termination, including, but not limited to reaching an understanding of the work to be performed by ALP and WJM&A and the accounting work that needed to be performed to ensure that ALP was properly compensated for revenues received by WJM&A.

25.    WJM&A refused to engage in good faith discussions with ALP intended to reach an orderly and proper winding up of the relationship.

26.     In or around April 2015, a time in which the parties were supposed to be winding up their relationship, WJM&A began to surreptitiously rent ALP's List directly to ALP's competitors.  ALP had previously made it abundantly clear that ALP would not allow its List to be used in this manner, and repeatedly warned WJM&A against just this type of conduct.

27.     WJM&A's conduct caused ALP's List recipients to receive advertising and communications from ALP's direct competitors on various platforms (including for products in direct competition with those offered by ALP).  WJM&A apparently also made the List readily available to ALP's competitors so that much, if not all, of its proprietary value was compromised.  All the while, WJM&A simply ignored ALP's repeated written and oral pleas not to engage in this type of subterfuge.

28.     WJM&A also entirely failed and refused to account for any revenues received from rentals of ALP's List, including the revenues received from rentals to ALP's own competitors.

29.     As of the date that the joint venture relationship came to an end – May 31, 2015 – WJM&A had never provided a full accounting of the funds received pursuant to the parties' joint venture, nor had it sent even the first dollar of earnings to ALP.

30.     After Defendants had promised, and then failed, to provide a final reconciliation detailing all costs incurred and revenues received pursuant to the parties' joint venture relationship, ALP spent a significant amount of time preparing that reconciliation itself (at least as best it could with the information available – the reconciliation may have omitted funds due ALP that it was unaware of).  ALP forwarded that reconciliation to WJM&A in late July 2015. In conjunction with that reconciliation, ALP requested that WJM&A immediately pay ALP its portion of the joint venture funds from the Escrow Account.

31.    Defendants failed and refused to respond to that reconciliation with any degree of substance, for a period of weeks.  During that intervening period, Defendants also failed to pay any of the joint venture revenues to ALP or to provide any information at all to ALP.

32.    Mr. Bellinger grew more and more suspicious that the Defendants had never created the Escrow Account in the first place, but rather embezzled all List rental revenues received.  For weeks after ALP sent the original reconciliation to the Defendants, Mr. Bellinger sent repeated emails demanding that the Defendants provide account information for the Escrow Account.  Defendants refused to respond at all, even when Mr. Bellinger directly stated that it appeared the Defendants had embezzled the joint venture funds.

33.    In August 2015, well after ALP terminated the joint venture relationship, ALP learned that WJM&A had previously contracted with a third party to rent the List.  The third party customer had prepaid WJM&A for that List rental.  The third party customer then sought confirmation directly from ALP that that the commitment would be honored, as the performance date on that agreement was rapidly approaching.

34.    While WJM&A admitted entering into the agreement with the customer and admitted receiving full payment, the Defendants refused to identify where they deposited the money; they refused to provide ALP with ALP's rightful portion of that revenue; yet they demanded that ALP fulfill WJM&A's obligations under the agreement with the third party. Faced with a "Hobsen's choice" of providing its List essentially for free (given that WJM&A had embezzled the revenue) or refusing to honor the customer's agreement but then facing the prospect of imminent litigation, ALP itself fulfilled the customer's agreement.  Incredibly, the Defendants repeatedly demanded that ALP fulfill the agreement, even after it became clear to all involved that the Defendants had embezzled the revenue.

35.     As of the end of August, Defendants continued their refusal to pay ALP anything at all, and continued their failure to respond with any degree of substance as to why it objected to the reconciliation prepared by ALP.

36.     In early September, Defendants finally responded with some areas of clarification regarding the reconciliation.  However, Defendants remained steadfast in their failure and refusal to pay anything at all to ALP, and failed and refused to confirm the existence of the Escrow Account.

37.     Taking some of Defendants' concerns into account, on October 9, 2015, ALP provided Defendants with an updated final reconciliation, which reflected a total amount due from WJM&A to ALP of $69,648.86.

38.     The Defendants failed and refused to respond for two weeks.  When Defendants finally responded (via an email from Bill McCarthy), Defendants refused to pay any money at all.  Rather, Bill McCarthy claimed that he was too busy to respond in substance (other than to make false accusations that the final reconciliation was somehow inaccurate).  When then pressed for specifics, he failed and refused to respond at all.

39.     On October 25, 2015, Mr. Bellinger sent an email to Bill McCarthy asking for a substantive response and further asking if the Defendants' refused to pay ALP its funds because the Defendants moved or spent the money.  Defendants failed to respond at all.

### Defendants' Theft of ALP's Editorial Content

40.     After ALP terminated the parties' joint venture relationship and Defendants continually rebuffed ALP's repeated requests for payment, ALP learned for the first time that the McCarthys owned and operated a website at www.selfreliancecentral.com.  Kelly McCarthy also refers to herself as a "founder" of the website.

41.    Selfreliancecentral.com maintains and publishes editorial content aimed at ALP's target audience, and is directly competitive with ALP.

42.    Had the Defendants disclosed their ownership of www.selfreliancecentral.com, ALP would never have entered into the joint venture relationship with WJM&A.

43.    The majority of the editorial content published on selfreliancecentral.com credits "Kelly" as having written the content.

44.    After reviewing the content published on selfreliancecentral.com, ALP personnel were shocked to discover that after ALP granted the Defendants access to ALP's content database for purposes of the joint venture, a huge number of articles published on selfreliancecentral.com contained varying degrees of content stolen directly from articles previously published by ALP, including content registered with the United States Copyright Office.  As of the date of this Complaint, ALP is aware of at least the following egregious examples where the Defendants stole ALP's editorial content and published that content on selfreliancecentral.com without ALP's knowledge or consent:

    a.    Prior to September 30, 2014, ALP published an article titled "Starfish Prime + HEMP = Faraday Cage" at http://www.independentlivingnews.com/preppers/starfish-prime-hemp-faraday-cage.stml#.VfGjybS-X8k.  On June 10, 2015, Defendants published this article in its entirety at http://www.selfreliancecentral.com/2015/06/10/the-deadly-spawn-of-starfish-prime/, and retitled it "The Deadly Spawn of Starfish Prime."

    b.    On multiple occasions in or prior to January 2015, ALP published an article titled "Avoid These First-Time Gun Buying Mistakes" in print, and then online at http://www.independentlivingnews.com/2nd-amendment/self-defense/20724-

avoid-these-first-time-gun-buying-mistakes.stml#.VfGnS7S-X8k.    On  or  about

June 29, 2015, Defendants published an article titled "Buying Your First Firearm?

Read            This            Before            You            Shop"            at

http://www.selfreliancecentral.com/2015/06/29/buying-your-first-firearm-read-

this-before-you-shop.    Almost 90% of the article published by Defendants is

identical to ALP's article, though Defendants made minor changes to the lead and

final paragraphs.

c.    In 2011, ALP published an article in its Medical Self Reliance Manual discussing

items to keep in your medicine cabinet.  On April 24, 2015, Defendants published

an    article    titled    "What's    in    Your    Medicine    Cabinet"    at

http://www.selfreliancecentral.com/2015/04/24/what-to-put-in-your-medicine-

cabinet/, which is largely identical to the content previously published by ALP.

d.    On or about March 7, 2014, ALP published an article titled, "Defensive Landscaping

– Worth  the  Effort"  at  http://www.independentlivingnews.com/preppers/defensive-

landscaping-worth-the-effort.stml#.VfGtQ7S-X8k.    On May 12, 2015, Defendants

published  an  article  titled  "Protect  Your  Home  with  Defensive  Landscaping"  at

http://www.selfreliancecentral.com/2015/05/12/protecting-your-home-with-

defensive-landscaping/.  The vast majority of the article published by Defendants is

identical to the article previously published by ALP.

e.    On or about December 31, 2013, ALP published an article titled, "Survive in Place 7

DIY  Tips"  at  http://www.independentlivingnews.com/diy/shelter-in-place/20828-

survive-in-place-7-diy-tips.stml#.VfHXCLS-X8l.  ALP had previously published the

article in print, titled "17 Ways to Make Your Home a Fortress."  On September 9,

2015, Defendants published an article titled **"**Survive in Place – Seven Savvy DIY Tips**"** at http://www.selfreliancecentral.com/2015/06/09/survive-in-place-seven-savvy-diy-tips/. Numerous portions of the article published by Defendants are identical to the article previously published by ALP.

f.   On or about October 10, 2014, ALP published an article titled "Can You Survive without Power for Two Years?" at http://www.independentlivingnews.com/energy/failing-power-grid/201251-can-you-survive-without-power-for-2-yearsa.stml#.VfHc9bS-X8k. On May 27, 2015, Defendants published an article titled "Faraday Cages: Making One and How Your Microwave Oven Can Help" at http://www.selfreliancecentral.com/2015/05/27/can-you-survive-without-power-for-years/. The majority of the article published by Defendants is identical to that previously published by ALP, though throughout, Defendants made a handful of changes. Lest there be any doubt about Defendants' theft, their article contains, word for word, the language of an advertisement which appeared on ALP's webpage part-way through the article. Defendants did not even realize this as they published the language of the advertisement as part of "their" article.

g.   Prior to September 30, 2014, ALP published an article titled "Obama's Federal Hand in Your Doctor's Pocket" at http://www.independentlivingnews.com/privacy/medical-privacy/203381-obamas-federal-hand-in-your-doctors-pocket.stml#.VfHjUrS-X8k**.** On April 20, 2015, Defendants published an article titled, "Americans Flee Traditional Health Coverage Because of Privacy Concerns" at

http://www.selfreliancecentral.com/2015/04/10/americans-flee-traditional-heath-coverage-because-of-privacy-concerns/.    Numerous portions of the article published by Defendants are identical to that previously published by ALP.

h.  In the May 2015 print issue of Independent Living News, ALP published an article titled "Protect Assets and Reduce Taxes with Trusts."  The article had been written well in advance of being published, and was included in ALP's content database.  On April 7, 2015, Defendants published an article titled "Trust Funds Are      Not      Just      for      the      Wealthy"      at http://www.selfreliancecentral.com/2015/04/07/trust-funds-are-not-just-for-the-wealthy.  Significant portions of the article published by Defendant are identical to that previously created by ALP, and published in its print newsletter.

i.  In the October 2014 print issue of Independent Living News, ALP published an article titled, "How Your Insured Accounts Could Go Poof!"  ALP also published the      article      online      prior      to      the      summer      of      2015      at http://www.independentlivingnews.com/finances/202305-how-your-insured-accounts-could-go-poof-steps-to-protect-your-funds-from-being-lost-stolen-or-seized.stml#.VfLpY7S-X8k.  On or about August 24, 2015, Defendants published an article titled "Protect Your Funds from Being Lost, Stolen, or Seized" at http://www.selfreliancecentral.com/2015/08/24/protect-your-funds-from-being-lost-stolen-or-seized/.  The vast majority of Defendant's article is identical to that previously published by ALP.  Particularly egregious is Defendant's change of the wording "We've always advocated …" to "Self-Reliance Central advocates …" as if Defendants had anything whatsoever to do with creating the article other

than stealing it from ALP's database and republishing it without ALP's knowledge or consent.

j.   On or about January 31, 2014, ALP published an article titled, "Beware! These Popular Websites Aren't Safe" at http://www.independentlivingnews.com/privacy/email-social-media-security/20913-beware-these-popular-websites-arent-safe-.stml#.VfLuGrS-X8k. On June 11, 2015, Defendants published an article titled "5 Things You Must Know About Social Media" at http://www.selfreliancecentral.com/2015/06/11/5-things-you-must-know-about-social-media/.   Other than their deletion and addition of a few paragraphs, Defendants' published article is a word-for-word theft of ALP's previously-published article.

k.   On or about May 6, 2015, ALP published an article titled, "Half the Population in Danger Because of Government Advice" at http://www.independentlivingnews.com/health/colloidal-silver/20728-half-the-population-in-danger-because-of-govt-advice.stml#.VfLxxLS-X8k.   The article was first created in October 2013.   On June 4, 2015, Defendants published an article titled, "Is Salt Really That Bad for You?   Probably Not." at http://www.selfreliancecentral.com/2015/06/04/is-salt-really-that-bad-for-you-probably-not/.   While Defendants' article changes a handful of words here and there, the majority of the Defendants' article contains a word-for-word theft of the article previously published by ALP.

l.   Prior to September 30, 2014, ALP published an article titled, "How to Give Your Doctor a Check-Up" at http://www.independentlivingnews.com/health/201848-

how-to-give-your-doctor-a-check-up.stml#.VfL0f7S-X8k.  The article previously

appeared in ALP's Medical Self-Reliance Mega-Manual.  On June 24, 2015,

Defendants published an article titled, "How to Give Your Doctor a Check Up" at

http://www.selfreliancecentral.com/2015/06/24/how-to-give-your-doctor-a-check-

up/.  With the exception of a couple of new sentences, the Defendants' article is

identical to that previously published by ALP.

m.  In the March 2013 print edition of Independent Living News, which was

registered with the United States Copyright Office, ALP published an article

titled, "4 Reasons You Need this Forgotten Communications Device."  ALP

published this same article on or about March 12, 2014 at

http://www.independentlivingnews.com/preppers/prepper-planning/20534-4-

reasons-you-need-this-forgotten-communications-device.stml#.VfL3fLS-X8k.

and retitled the article "7 Tips for Communicating When All Hell Breaks Loose"

and published it at http://www.independentlivingnews.com/preppers/7-tips-for-

communicating-when-all-hell-breaks-loose.stml#.VfL6ibS-X8k.        ALP  also

published the article in the print Ultimate Self-Reliance Mega Manual.  The

second article published in Independent Living News contains a true story about

Mr. Bellinger being in Washington D.C. during the attacks on the United States

on September 11, 2001.  On June 2, 2015, Defendants published an article titled,

"10-4 Big Buddy. Are You Missing a Big Piece of Your Preparedness Plan?" at

http://www.selfreliancecentral.com/2015/06/02/10-4-big-buddy-are-you-missing-

a-big-piece-of-your-preparedness-plan/.  Defendants' article contains significant

portions of word-for-word theft of the original and revised versions of ALP's article.

45.     In addition to the above-referenced thefts of ALP's editorial content, ALP discovered dozens of other instances in which the Defendants stole portions of ALP's editorial content and utilized that content in articles published on selfreliancecentral.com without ALP's knowledge or consent.  In the vast majority of these instances, Defendants published the stolen content in articles purportedly written "by Kelly."

46.     Upon information and belief, Defendants began stealing and republishing ALP's editorial content almost immediately after ALP gave notice of its termination of the MOU.

### Defendants' Theft and Misuse of ALP's List

47.     Also following ALP's termination of its joint venture agreement with WJM&A, ALP learned that the Defendants made a copy of ALP's List, and have rented that List to various third parties, including to direct competitors of ALP.  Despite ALP's repeated demands that Defendants immediately cease utilizing the List, Defendants continue to use ALP's own proprietary List to compete with ALP.

### Necessity for Court Intervention

48.     Considering all of the above circumstances, it is plain that from the very first conversations between Mr. Bellinger and the McCarthys, the McCarthys never intended to participate in good faith in a joint venture relationship with ALP for the parties' mutual benefit. Rather, Defendants' conduct evidences a carefully thought-out and executed plan to destroy ALP's business for their own profit, and to do so by taking advantage of a confidential and fiduciary relationship that Defendants lured ALP into, via false promises of good faith.

49.    As of the date of this Complaint, ALP has been harmed in at least following ways by Defendants' fraudulent, intentional and malicious conduct:

a.  Defendants have failed and refused to pay ALP any funds at all stemming from their joint venture relationship.  ALP's final reconciliation reveals that the amount due to ALP is believed to be at least $69,648.86, yet Defendants have paid no money, and apparently embezzled the full amount of those funds, having never opened the Escrow Account as required by the MOU;

b.  Over the course of the past six months, in dozens of instances, Defendants misappropriated and published on www.selfreliancecentral.com ALP's editorial content, including works registered with the United States Copyright Office;

c.  Presumably, Defendants stole ALP's editorial content to dupe recipients of their marketing efforts into believing that they are endorsed by ALP, or that Mr. Bellinger himself is involved with Defendants' efforts.  Not only is that patently false (as ALP would never allow its content to be utilized to support individual political candidates or to send political messages in the reckless manner done by Defendants), but even worse, Defendants have paid no money at all to ALP for the use of ALP's proprietary editorial content;

d.  Defendants stole and are utilizing a copy of ALP's proprietary List without ALP's consent;

e.  ALP's List has been compromised in that it was mismanaged (such as using the List to market inappropriate products and content), damaging ALP's relationships with its customers; and

f.  ALP's List was used to market and sell competing products to ALP's own customers.

50.    Left with no options to protect its rights and interests, ALP brings this civil action seeking to recover substantial monetary damages for Defendants' malicious conduct, and further seeking preliminary and permanent injunctive relief to prevent further theft and misuse of ALP's List and editorial content.

## FIRST CLAIM FOR RELIEF
### [Breach of Contract - WJM&A]

51.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

52.    The MOU is a valid and enforceable contract between ALP and WJM&A.

53.    ALP has fully performed all of its obligations under the MOU.

54.    WJM&A has materially breached the MOU by failing and refusing to pay ALP funds it is owed pursuant to the MOU and misappropriating and misusing ALP's proprietary information contrary to the terms of the MOU, as more fully described above.

55.    As a direct and proximate result of WJM&A's breach of the MOU, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.

## SECOND CLAIM FOR RELIEF
### [Breach of Contract Accompanied by Fraud – WJM&A]

56.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

57.    As set forth above, WJM&A breached the MOU by failing and refusing to pay ALP funds it is owed and by misappropriating and misusing ALP's proprietary information contrary to the terms of the MOU.

58.    WJM&A fraudulently intended to breach the MOU.

59.    WJM&A's breach was accompanied by fraud, as set forth more fully below.

60.    As a direct and proximate result of WJM&A's breach of contract accompanied by fraud, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.

## THIRD CLAIM FOR RELIEF
### [Fraud – All Defendants]

61.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

62.    Among other things, Defendants represented to ALP that they would participate in the joint venture in good faith for the parties' mutual benefit and that all funds collected through the joint venture would be deposited into a newly-created escrow account, and promised that they would manage ALP's proprietary List in such a manner that the List's propriety value would be maintained and would never utilize the List in a manner competitive with or adverse to ALP's interests.

63.    Defendants' representations were material to ALP's decision to enter into the MOU and entrust its proprietary List and copyrighted materials to Defendants' care.

64.    Defendants' representations were false and were made with knowledge of their falsity or with reckless disregard for their truth or falsity.

65.    Defendants intended that their representations be acted upon by ALP, and ALP justifiably relied on Defendants' representations in entering into the MOU and entrusting its proprietary information and trade secrets to Defendants.

66.    As a direct and proximate result of Defendants' fraudulent representations, ALP has been damages in an amount to be proven at trial but which is believed to exceed $75,000.

## FOURTH CLAIM FOR RELIEF
### [Tortious Interference with Contract and Prospective Contract – All Defendants]

67.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

68.     Defendants were aware of ALP's existing contracts and business relationships, as well as the prospective contractual relations with potential lessees of ALP's proprietary List.

69.     As set forth above, Defendants intentionally interfered with ALP's prospective contractual relations with both potential lessees of its proprietary List and with its contractual relations with existing clients.

70.     Defendants' interference with ALP's existing and prospective contractual relations was done through improper and fraudulent methods and for the improper purpose of embezzling ALP's funds and misappropriating ALP's trade secrets.

71.     Defendants acted without justification, and with malice, in interfering with the existing and prospective contracts and business relationships  of ALP.

72.     As a direct and proximate result of Defendants' interference with ALP's existing and prospective contracts, ALP has been harmed in an amount to be proven at trial but which is believed to exceed $75,000.

## FIFTH CLAIM FOR RELIEF
### [Breach of Fiduciary Duty – All Defendants]

73.     ALP restates and realleges the preceding paragraphs as if fully set forth herein.

74.     ALP reposed special confidence and trust in Defendants.

75.     As a result of ALP and Defendants' relationship of confidence and trust, Defendants owe fiduciary duties to ALP to act in good faith and with due regard for ALP's interests.

76.     As set forth above, Defendants breached their fiduciary duties to ALP.

77.     As a direct and proximate result of Defendants' breaches of their fiduciary duties, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.

## SIXTH CLAIM FOR RELIEF
### [Constructive Fraud – All Defendants]

78.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

79.    Defendants were in a confidential and fiduciary relationship with ALP.

80.    Among others, Defendants represented to ALP that they would participate in the joint venture in good faith for the parties' mutual benefit and that all funds collected through the joint venture would be deposited into a newly-created escrow account, and promised that they would manage ALP's proprietary List in such a manner that the List's propriety value would be maintained and would never utilize the List in a manner competitive with or adverse to ALP's interests.

81.    Defendants' representations were material to ALP's decision to enter into the MOU and entrust its proprietary List and copyrighted materials to Defendants' care.

82.    Defendants' representations were false and were made with knowledge of their falsity or with reckless disregard for their truth or falsity.

83.    ALP was ignorant of the falsity of Defendants' representations.

84.    ALP had a right to rely on Defendants' representations and in fact did justifiably rely on Defendants' representations in entering into the MOU and entrusting ALP's proprietary information and trade secrets to Defendants.

85.    As a direct and proximate result of Defendants' fraudulent representations, ALP has been damages in an amount to be proven at trial but which is believed to exceed $75,000.

## SEVENTH CLAIM FOR RELIEF
### [Constructive Trust – All Defendants]

86.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

87.    Defendants were in a confidential and fiduciary relationship with ALP.

88.     Defendants intentionally breached their fiduciary duties to ALP.

89.     As described more fully above, Defendants have obtained funds due and owing to ALP, pursuant to the MOU, through Defendants' own fraudulent conduct and breach of fiduciary duty.  Those funds do not equitably belong to Defendants.

90.     ALP has an ownership interest in whatever funds and benefits have flowed to Defendants, directly or indirectly, by virtue of their improper conduct set forth above.

91.     Defendants may not, in good conscience, retain or withhold from ALP those funds to which it is beneficially entitled.

92.     Defendants are required to hold in trust all the funds due and owing to ALP and all profits and benefits they have derived therefrom.

93.     As a result of Defendants' retention of funds due and owing to ALP and fraudulent and intentional misconduct, ALP is entitled to an order of the Court placing a constructive trust upon the real and personal property of Defendants, wherever located, that was purchased using the funds misappropriated by Defendants.  ALP has an equitable interest in all such personal and real property.

## EIGHTH CLAIM FOR RELIEF
### [Conversion]

94.     ALP restates and realleges the preceding paragraphs as if fully set forth herein.

95.     As described herein, Defendants assumed and exercised the right of ownership over funds belonging to ALP pursuant to the MOU, without authorization from ALP and to the exclusion of ALP's rights as the legal and equitable owner of the funds.

96.     Defendants continue to detain ALP's funds after repeated demand by ALP that its fund be turned over to ALP.

97.     Defendants' actions constitute conversion of ALP's funds, in that they have wrongfully and impermissibly converted to their own use, enjoyment and control substantial funds rightly belonging to ALP.

98.     As a direct and proximate result of Defendants' conversion of ALP's funds, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.

## NINTH CLAIM FOR RELIEF
### [Misappropriation of Trade Secrets]

99.     ALP restates and realleges the preceding paragraphs as if fully set forth herein.

100.     ALP's proprietary List derives independent economic value from not being generally known to the public and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use (including ALP's competitors).

101.     ALP makes efforts that are reasonable under the circumstances to maintain the secrecy of the List.

102.     The List constitutes a trade secret.

103.     As set forth above, Defendants acquired ALP's proprietary List through improper means, including misrepresentation, breach of contractual and fiduciary duties, and other intentional misconduct.

104.     Further, Defendants disclosed and used ALP's proprietary List without the express or implied consent of ALP while knowing, or having reason to know, that they owed a duty to ALP to maintain the secrecy of the List and limit its use.

105.    As a direct and proximate result of Defendants' misappropriation of ALP's trade secrets, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.

106.    Pursuant to S.C. Code Ann. § 39-8-40 and as a result of Defendants' willful, wanton, and intentional disregard of ALP's rights in connection with Defendants' misappropriation of trade secrets, ALP is also entitled to exemplary damages in an amount twice its actual damages.

107.    Pursuant to S.C. Code Ann. § 39-8-80, ALP is also entitled to recover its reasonable attorneys' fees as a result of Defendants' willful misappropriation of trade secrets.

### TENTH CLAIM FOR RELIEF
**[Unfair and Deceptive Trade Practices]**

108.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

109.    Defendants' actions as described above were in the conduct of trade and commerce, which have harmed the public and are capable of repetition.

110.    Defendants' conduct described above constitutes unfair and deceptive acts and practices in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*

111.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.  As a result of Defendants' willful and knowing violation of the South Carolina Unfair Trade Practices Act, ALP is also entitled to recover treble damages pursuant to S.C. Code Ann. § 39-Pursuant to S.C. Code Ann. § 39-5-140(a).

### ELEVENTH CLAIM FOR RELIEF
**[Copyright Infringement – All Defendants]**

23

112.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

113.    ALP's editorial content and articles described above are original, copyrighted works pursuant to 17 U.S.C. § 101, *et seq.*

114.    Some of ALP's copyrighted works are registered with the United States Copyright Office.

115.    ALP currently holds the copyright for all editorial content and articles described above.  At all times relevant to this Complaint, Defendants knew that ALP was the rightful owner of the copyright for its editorial content and articles.

116.    As described more fully above, Defendants willfully infringed ALP's copyrights, for profit, by reproducing, publishing, displaying, distributing, preparing derivative works based upon, and otherwise exploiting ALP's copyrighted material without ALP's express or implied permission, in violation of 17 U.S.C. §§ 106, 501.  Specifically, Defendants copied and published on its website materials which are identical to or substantially derived from ALP's copyrighted works.

117.    Defendants' acts of infringement are willful, intentional, purposeful, and done with intentional disregard of ALP's rights.

118.    As a direct and proximate result of Defendants' willful and repeated copyright infringement, and pursuant to 17 U.S.C. §§ 501 and 504, ALP is entitled to actual damages and all profits realized by Defendants as a result of their infringement of ALP's copyrights in an amount to be proven at trial but which is believed to exceed $75,000.

119.    ALP is also entitled to recover its costs and attorneys' fees incurred in connection with Defendants' infringement of those works that have been registered with the United States Copyright Office, pursuant to 17 U.S.C. § 505.

120.    In the alternative, ALP is entitled to statutory damages for Defendants' copyright infringement of those works that have been registered with the United States Copyright Office, pursuant to 17 U.S.C. § 504(c).

## TWELFTH CLAIM FOR RELIEF
### [Preliminary and Permanent Injunctive Relief – All Defendants]

121.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

122.    As set forth above, Defendants have misappropriated and misused ALP's List by renting it to third parties and misusing the List without ALP's permission.

123.    ALP seeks a preliminary and permanent injunction prohibiting Defendants from using, publishing, selling, renting, transferring, assigning, editing, or otherwise utilizing ALP's List or copyrighted information.

124.    ALP has demonstrated a likelihood of success on the merits of its claims for relief, and that a balancing of the equities favors issuance of a preliminary and permanent injunction.

125.    ALP has and will continue to suffer immediate and irreparable harm to its financial interests, reputation, and rights under federal copyright law absent entry of preliminary and permanent injunctions preventing Defendants from using, publishing, selling, renting, transferring, assigning, editing, or otherwise utilizing ALP's List or copyrighted information.

126.    ALP has no adequate remedy at law.

127.    ALP is also entitled to a preliminary and permanent injunction under 17 U.S.C. § 502(a) to prevent and restrain Defendants from further infringing on copyrights owned by ALP.

128.    ALP is further entitled to a preliminary and permanent injunction under S.C. Code Ann. § 39-8-50 to prevent the continued actual and threatened misappropriation of ALP's proprietary List by Defendants.

129.    By virtue of the allegations contained herein, ALP is entitled to preliminary and permanent injunctive relief as set forth above.

130.    Entry of the requested injunctive relief will cause no discernible harm to Defendants, such that any injunction bond should be set at a minimal amount.

**THIRTEENTH CLAIM FOR RELIEF**
**[Punitive Damages – All Defendants]**

131.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

132.    Because Defendants' acts were malicious, willful, wanton, and done with an intentional disregard of ALP's rights and interests, ALP is entitled to recover punitive damages for their wrongful conduct.

**FOURTEENTH (ALTERNATIVE) CLAIM FOR RELIEF**
**[Civil Conspiracy – All Defendants]**

133.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

134.    As set forth above, Defendants together entered into an agreement to act, and did act, pursuant to a common scheme for the purpose of unlawfully and tortiously harming the business relationship between ALP and its existing customers and prospective contractual partners, harming ALP's reputation, diminishing the value of ALP's proprietary List, embezzling funds owed to ALP, and misappropriating ALP's proprietary information and copyrighted works.

135.    Defendants' conspiracy was successful, in that through their deception, they have misappropriated thousands of dollars owed to ALP, misappropriated and misused ALP's proprietary information and copyrighted works, and damaged both ALP's reputation and its existing and prospective business relationships.

136.    As a direct and proximate result of Defendants' civil conspiracy, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.


## FIFTEENTH (ALTERNATIVE) CLAIM FOR RELIEF
### [Unjust Enrichment – All Defendants]

137.    ALP restates and realleges the preceding paragraphs as if fully set forth herein.

138.    As set forth more fully above, Defendants have been unjustly enriched by their intentional and fraudulent misconduct.

139.    As a direct and proximate result of Defendants' unjust enrichment, ALP has been damaged in an amount to be proven at trial but which is believed to exceed $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court for the following relief

1.    Entry of judgment against Defendant WJM&A, in an amount in excess of $75,000, plus interest, for its breach of contract and breach of contract accompanied by fraud;

2.    Entry of judgment against all Defendants, jointly and severally, in an amount in excess of $75,000, plus interest, for their fraud, tortious interference with contract and prospective contract, breach of fiduciary duty, constructive fraud, conversion, misappropriation of trade secrets, unfair and deceptive trade practices, conversion, copyright infringement, and alternatively, civil conspiracy and unjust enrichment;

3.    Entry of an order imposing a constructive trust upon the real and personal property of Defendants, wherever located, that was purchased using the funds misappropriated by Defendants;

4.      Entry of an award of Plaintiff's reasonable attorneys' fees pursuant to all applicable South Carolina and federal laws, including, but not limited to S.C. Code § 39-8-40, and 17 U.S.C. § 505.

5.      Entry of an award of treble Plaintiff's actual damages (pursuant to S.C. Code § 39-5-140(a)), or alternatively, double Plaintiff's actual damages (pursuant to S.C. Code § 39-8-40), or alternatively, punitive damages, for Plaintiff's malicious, intentional and bad faith conduct;

6.      Alternatively, entry of an award of statutory damages for Defendant's violation of Plaintiff's registered copyrighted works, pursuant to 17 U.S.C. § 504(c);

7.      Entry of an order prohibiting Defendants from making use of, or transferring, Plaintiff's List and requiring the surrender or documented destruction of all copies thereof;

8.      For entry of an award of all costs incurred by Plaintiff in filing and prosecuting this action;

9.      For a trial by jury on all issues so triable; and

10.     For all such other and further relief that the Court deems just and equitable.

This the 4th day of December, 2015.

**JAMES, McELROY & DIEHL, P.A.**

/s/ J. Mitchell Aberman
J. Mitchell Aberman (Fed ID No.: 243)
S.C. State Bar No.: 276
600 South College Street, Suite 3000
Charlotte, North Carolina 28202
Telephone:     704-372-9870
Fax:    704-333-5508
E-Mail:  maberman@jmdlaw.com
*Attorneys for American Lantern Press, Inc.*
